UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SYNACOR, INC.,

Plaintiff,

v.

IMMAIL TECHNOLOGY LTD.,

Defendant.

---

25-CV-166-LJV
DECISION AND ORDER

On February 21, 2025, the plaintiff, Synacor, Inc. ("Synacor"), commenced this action for breach of contract and breach of the covenant of good faith and fair dealing against the defendant, imMail Technology Ltd. ("imMail"). Docket Item 1. More specifically, Synacor alleges that imMail breached their Distributor Agreement and Development Agreement and seeks damages and specific performance. *See id.* ¶¶ 41-66.

On April 14, 2025, after imMail did not respond to the complaint and its time to do so had expired, Synacor asked that a default be entered, Docket Item 8, and the Clerk of the Court entered a default the next day, Docket Item 9. Synacor then moved for a default judgment under Federal Rule of Civil Procedure 55(b)(2), seeking the following relief:

> 1) a monetary judgment in the amount of $550,000 against imMail for imMail's breach of the Professional Services Agreement as alleged in Count III of the [c]omplaint;
>
> 2) a monetary judgment in the amount of $23,400 for the attorney's fees Synacor incurred in connection with this litigation;

> 3) a judgment against imMail on Counts I and II of the [c]omplaint and an [o]rder directing imMail, and any and all entities in privity therewith who are served with a copy of the Court's [o]rder, to immediately restore access to the [Software as a Service ("SaaS")] text feature to Synacor and its customers as such access existed prior to imMail's purported termination of the Distributor Agreement on February 14, 2025;
>
> 4) as an alternative to restoring access to the SaaS text feature, an [o]rder directing imMail, and any and all entities in privity therewith who are served with a copy of the Court's [o]rder, to provide access to all customer data maintained by imMail in connection with the SaaS text feature.

Docket Item 11-1 at 12.[1]

For the reasons that follow, this Court denies the motion for a default judgment without prejudice. Synacor may file an amended complaint within 30 days of the date of this decision and order and may renew its motion for a default judgment after that.[2]

## DEFAULT JUDGMENT STANDARD

Motions for default judgment are governed by Rule 55 of the Federal Rules of Civil Procedure, which "provides a two-step process." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). "The first step is to obtain an entry of default." *Id.* "When a party against whom affirmative relief is sought has failed to plead or otherwise

---

[1] Page numbers in docket citations refer to ECF pagination.

[2] Prior to filing a renewed motion for a default judgment, Synacor will again have to obtain the Clerk's entry of default. *See Am. Empire Surplus Lines Ins. Co. v. Concord Restoration Inc.*, 2021 WL 7830142, at *2 n.8 (E.D.N.Y. July 28, 2021) (holding that plaintiff's "filing of [an a]mended [c]omplaint... nullified th[e] entry of default" based on defendant's failure to answer original complaint), *report and recommendation adopted in part*, 2022 WL 950432 (E.D.N.Y. Mar. 30, 2022); *Allstate Ins. Co. v. Yadgarov*, 2014 WL 860019, at *8 & n.12 (E.D.N.Y. Mar. 5, 2014) ("[S]everal courts have found that once the original complaint is superseded, a clerk's entry of default on that pleading is mooted." (collecting cases)).

defend, a plaintiff may bring that fact to the court's attention." *Id*. at 504-05. "In such circumstances[,] Rule 55(a) empowers the clerk of court to enter a default." *Id*. at 505.

"The next step requires the plaintiff to seek a judgment by default under Rule 55(b)." *Id*. "Rule 55(b)(1) allows the clerk to enter a default judgment if the plaintiff's claim is for a sum certain and the defendant has failed to appear." *Id*. "In all other cases," Rule 55(b)(2) "requires a party seeking a judgment by default to apply to the court for entry of a default judgment." *Id*.

"Upon entry of default, all the well-pleaded allegations of the complaint are accepted as true." *Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 726 (W.D.N.Y. 2011) (citing *Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). "[P]rior to entering default judgment, a district court is 'required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (alterations omitted) (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)). And once liability is established, the Court must "consider whether the balance of equities favors a default judgment." *Trinkhaus v. Meezab Air Travel Mgmt. Co., Inc.*, 2021 WL 1405684, at *2 (W.D.N.Y. Apr. 14, 2021).

"It is within the sound discretion of the [d]istrict [c]ourt whether to enter a default judgment pursuant to Rule 55(b)(2), based on the assessment of the circumstances of the case and an evaluation of the parties' credibility and good faith." *Granite Music*, 786 F. Supp. 2d at 726 (citing *Shah v. New York State Department of Civil Service*, 168 F.3d 610, 615 (2d Cir. 1999)). In making that decision, courts address "the same factors that apply to a motion to set aside entry of a default." *Trinkhaus*, 2021 WL 1405684, at *2

(alteration omitted) (quoting *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123 (E.D.N.Y. 2011)). "Those factors include: '(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented.'" *Id.* (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993)).

After a court decides that the entry of a default judgment is legally and equitably warranted, it then must determine damages. *Id.* And before that can be done, the court must "ascertain the amount of damages with reasonable certainty." *Id.* (quoting *Credit Lyonnais Sec. (USA), Inc., v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).

## **SYNACOR'S ALLEGATIONS**

The complaint tells the following story. Synacor is a cloud-based software and services company with its headquarters in Hamburg, New York. Docket Item 1 ¶¶ 1-2. As part of its business, Synacor offers the "Zimbra Product," which is "a proprietary email, collaboration, and productivity tool . . . featur[ing] a range of tools that allow companies to securely communicate and organize data." *Id.* ¶ 12. When Synacor wanted to offer text and video chat modules ("imMail Chat Modules") as part of the Zimbra Product, it contracted imMail, a Canadian company, to create the imMail Chat Modules.[3] *Id.* ¶ 15.

---

[3] This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2). The parties are completely diverse, and the amount-in-controversy is more than $75,000. Docket Item 1 ¶¶ 5-6; *see Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). This Court has personal jurisdiction over the parties given the choice-of-law and forum-selection clauses in their Development Agreement. *See* Docket Item 1-1 at 5.

In late 2022, Synacor and imMail entered into two agreements. *Id.* ¶ 17; *see* Docket Items 1-1 and 21. The first was a "Professional Services Agreement dated December 2, 2022[,] for the development work needed to create the imMail Chat Modules and incorporate them into the Zimbra Product," which Synacor refers to as the "Development Agreement." Docket Item 1 ¶ 18. Under the Development Agreement, Synacor was to pay imMail development fees of $15,000 per month "in addition to various development related costs." *Id.* ¶ 19. In fact, "Synacor paid imMail over $300,000 in development fees . . . and approximately $250,000 in costs under the Development Agreement." *Id.* ¶ 21.

The second agreement was a "Distributor Agreement . . . under which imMail exclusively licensed imMail software to Synacor." *Id.* ¶ 22. Under the Distributor Agreement, if Synacor sold imMail's software, it owed imMail half of the proceeds in "each calendar quarter in which there [wa]s positive [n]et [s]ales arising from the sale of any imMail [s]oftware." *Id.* ¶ 26. Any payment owed by Synacor to imMail for the sale of imMail's software, however, was "first offset by any and all cumulative development fees paid to imMail for imMail's development work." *Id.* ¶ 27. The Distributor Agreement required imMail to place in escrow source code regarding the software licensed to Synacor, but imMail's source code was never deposited with an escrow agent. *Id.* ¶¶ 24-25.

Despite Synacor's payments to imMail under the Development Agreement, "imMail never delivered operable imMail Chat Modules." *Id.* ¶ 28. Instead, "[a]s a stop-gap measure, imMail provided a Software as a Service (or 'SaaS') based text chat

feature" that Synacor used in the Zimbra Product. *Id.* ¶ 29. Synacor terminated the Development Agreement on October 7, 2024. *Id.* ¶ 31.

On December 5, 2024, imMail's CEO, Leonardo Valenca, informed Synacor in a letter sent via email that it considered "the activation of over 15,000 enterprise licenses" without "receiv[ing] the required quarterly sales reporting" to be a "failure constitut[ing] a material breach of the [Distributor Agreement] under [s]ection 2.2." Docket Item 1-3 at 3. Synacor maintains that it "did not provide any revenue to imMail under the Distributor Agreement because the [d]evelopment [f]ees paid by Synacor had not been recouped." Docket Item 1 ¶ 33. Synacor also asserts that Valenca's letter "did not comply with any of the requirements for a Notice of Termination as established in [s]ection 12.7 of the Distributor Agreement"—rendering it an invalid attempt to terminate the Distributor Agreement. *Id.* ¶ 39.

On February 14, 2025, Valenca sent a second letter via email "abruptly announcing the termination of the Distributor Agreement." *Id.* ¶ 36. Synacor and its customers were then "locked out of the SaaS [t]ext [f]eature that imMail had [been] provid[ing]" for the Zimbra Product, which "caused and continues to cause Synacor monetary and reputational damage." *Id.* ¶¶ 36-37.

Synacor maintains that Valenca's second letter likewise did not comply with the Distributor Agreement's requirements for termination, such as formally asking Synacor to cure any alleged breaches. *Id.* ¶ 38. Therefore, Synacor says, "imMail's termination of the Distributor Agreement was ineffective[, and] imMail's subsequent actions in terminating Synacor's access to the Saas [t]ext [f]eature constitute[d] a breach of the Distributor Agreement." *Id.* ¶¶ 45-46.

## DISCUSSION

Because this Court's jurisdiction is based on diversity of citizenship, *see supra* note 1, the Court applies the substantive law of the State of New York, *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). To be successful on a breach of contract claim under New York law, a plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. MHC Holding Corp.*, 91 F.3d 337, 348 (2d Cir. 1996).

### I. DEVELOPMENT AGREEMENT

Synacor submitted a copy of the Development Agreement signed by both parties. *See* Docket Item 11-4 at 6. Synacor alleges that it performed under the Development Agreement by paying $550,000 "in development fees and . . . costs to imMail" and by "providing various technical assistance." Docket Item 11-1 at 6. And Synacor says that imMail breached that contract by "never provid[ing] Synacor with an operable, on-premises text/video chat module." *Id.*; *see also* Docket Item 1 ¶ 56 (alleging that "imMail's failure to deploy on-premises chat or video modules constitutes a breach of the Development Agreement").

Under the Development Agreement, imMail "warrant[ed] and represent[ed] that the [s]ervices w[ould] be performed in a professional and timely manner." Docket Item 1-1 at 2. But the Development Agreement did not specify a date by which imMail had to provide the imMail Chat Modules. *See generally id.* And in its complaint and motion for a default judgment, Synacor does not explain why the failure to deliver the imMail Chat Modules by October 7, 2024—the date Synacor terminated the Development

Agreement—constitutes a breach. The parties might well have contemplated performance within two years, but that is not necessarily so. Synacor therefore must provide additional facts for this Court to conclude that imMail breached the contract.

The motion for a default judgment as to the Development Agreement therefore is denied without prejudice. Synacor may file an amended complaint that demonstrates why a failure to deliver the imMail Chat Modules by October 7, 2024, constituted a breach of the condition that the services "be performed in a professional and timely manner." *See* Docket Item 1-1 at 2.

## II. DISTRIBUTOR AGREEMENT

Synacor alleges that imMail breached the Distributor Agreement "by sending a defective [n]otice of [t]ermination and thereafter locking Synacor and its customers out of the [SaaS text feature]." Docket Item 11-1 at 7. Synacor claims that Valenca's December 2024 letter "did not formally request Synacor to cure any breaches, which is a condition precedent to terminating the Distributor Agreement under [s]ection 11.2." Docket Item 1 ¶ 34.

In that letter, however, Valenca said that "while our Zimbra Chat and Video user activation report reflects the activation of over 15,000 enterprise licenses, we have never received the required quarterly sales reporting. This failure constitutes a material breach of the contract under [s]ection 2.2, 'Synacor Obligations.'" Docket Item 1-3 at 3. And section 11.2(a) of the Distributor Agreement says simply that "[e]ither party may terminate this [a]greement if the other party breaches any material term or condition of this [a]greement and fails to cure such breach within (30) days following receipt of written notice from the non-breaching party." Docket Item 21 at 17. Valenca's second

letter terminating the relationship was sent on February 14, 2025, more than 30 days after the letter giving notice of the claimed breach. Docket Item 11-3 ¶ 15.

This Court does not see why Valenca's December 2024 letter did not give notice sufficient to trigger Synacor's duty to cure. Therefore, before it can obtain a default judgment with respect to the Distributor Agreement, Synacor must explain in an amended complaint why the December 2024 letter was insufficient to give notice of the alleged breach.

Synacor also claims that imMail breached the covenant of good faith and fair dealing via its "abrupt termination of access to [the] SaaS [t]ext [f]eature [that] was unjustified and done without warning." Docket Item 1 ¶ 49. But "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Synacor alleges only that "imMail['s] terminating access to the SaaS [t]ext [f]eature breaches the covenant of good faith and fair dealing," Docket item 1 ¶ 52, and does not suggest how that breach is any different than imMail's alleged breach of the contract. Therefore, and because restriction of access also is an element of Synacor's breach of contract claim, Synacor has not established imMail's liability for breach of the covenant of good faith and fair dealing. Again, Synacor may address this deficiency in an amended complaint.[4]

[4] Because this Court finds that Synacor has not established imMail's liability, it need not and does not reach the issue of damages. The Court notes, however, that Synacor claims $550,000 for imMail's breach of the Development Agreement—the total amount of "fees and costs that Synacor paid to imMail under the agreement." Docket Item 11-1 at 5. But Synacor does not address the fact that imMail "provide[d] a SaaS

## CONCLUSION

For the reasons stated above, Synacor's motion for a default judgment, Docket Item 11, is DENIED without prejudice. Synacor may file an amended complaint within 30 days of the date of this decision and order and may then renew its motion for a default judgment.

SO ORDERED.

Dated: September 30, 2026
Buffalo, New York

***/s/ Lawrence J. Vilardo***
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

based text feature as a temporary stop gap measure." Docket Item 11-1 at 7; *see id.* ("Synacor deployed the SaaS text feature in the Zimbra product, and its customers utilized and relied upon it."). It is not clear to the Court why the entire amount paid under the contract should be returned to Synacor when imMail provided some services.